# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|                                                          |     |                              |
| -------------------------------------------------------- | --- | ---------------------------- |
| GRECIAN GILL,                                            | )   |                              |
|                                                          | )   |                              |
| Plaintiff,                                               | )   |                              |
|                                                          | )   |                              |
| v.                                                       | )   | Case No. 21-00411-CV-W-LMC   |
|                                                          | )   |                              |
| DENIS MCDONOUGH, SECRETARY,                              | )   |                              |
| UNITED STATES DEPARTMENT OF                              | )   |                              |
| VETERANS AFFAIRS, *et al.*,                              | )   |                              |
|                                                          | )   |                              |
| Defendants.                                              | )   |                              |

## ORDER

Pending before the Court is the "Motion of the Secretary of the Department of Veterans Affairs for Summary Judgement" (Doc. #39) and "Motion to Dismiss the United States as a Named Defendant" (Doc. #40).

## I.  BACKGROUND

Plaintiff Grecian Gill brought this employment discrimination case against Denis McDonough as Secretary of the Department of Veterans Affairs in his official capacity and the United States of America and its Agency, the United States Department of Veterans Affairs, Kansas City Veterans Administration Hospital.  (Doc. #1 ¶¶ 6, 7.)

Defendant United States moves for dismissal of claims against it as it is not a proper party in this action.  (Doc. #40.)  Plaintiff has not responded and the time for doing so has now passed. Title VII clearly states that the proper defendant in civil actions under Title VII shall be the head of the department.  42 U.S.C. § 2000e-16(c); *see also Morgan v. U.S. Postal Serv.*, 798 F.2d 1162, 1165 n.3 (8th Cir. 1986) (finding that the head of the federal department "is the only properly

named defendant in an employment discrimination suit against the [department].") Therefore, the United States is dismissed from this action.

Defendant McDonough, as Secretary of the Department of Veterans Affairs, also moves for summary judgment of all claims. (Doc. #39.) For the reasons stated below, the motion is granted.

## II.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. "Material facts" are those "that might affect the outcome of the suit under the governing law," and a "genuine" material fact involves evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991). If the moving party meets its initial burden, the nonmoving party must then produce specific evidence to demonstrate genuine issues for trial. *Id.* When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but must set forth, via citation to material in the record, specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(c)(1); *Stone Motor Co. v. General Motors Corp.*, 293 F.3d 456, 465 (8th Cir.

2

2002). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). The Court may not weigh the evidence in the record, decide credibility questions or determine the truth of factual issues, but merely decides if there is evidence creating a genuine issue for trial. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999), *abrogated on other grounds by Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011).

III.    <u>UNDISPTED FACTS</u>

The following facts are uncontroverted unless otherwise noted:

A. <u>Gill's Probationary Employment at the Kansas City VA Medical Center (KCVAMC)</u>

1. Ms. Gill was hired at the KCVAMC as a Medical Support Assistant on March 17, 2019. (Doc. #39-1 at 4-5 (Exh. A); Doc. #39-2 (Exh. B)) (Defendant's Statement of Uncontroverted Material Facts (DSUMF) #1.)

2. Ms. Gill was hired pursuant to 38 U.S.C. § 7401(3) and was subject to a one-year probationary period set to end in March of 2020. (Doc. #39-2 at 7-8 (Exh. A); Doc. #39-2 (Exh. B); Doc. #39-3 at 1-4 (Exh. C)) (DSUMF #2.)

3. Within the VA, the probationary period for new hires was viewed as "an extension of the appointment process." As further articulated by the agency:

> [The probationary period] provides the final test of the appointee's qualifications, i.e., actual performance on the job. During the probationary period, the employee's conduct and performance will be closely observed. The employee may be separated from the service if not found fully qualified and satisfactory. Thus, the probationary period provides a safeguard against retention of any person who, despite having met legal and regulatory requirements for appointment, is found in actual practice to be unsuited for

3

retention in the Veterans Health Administration (VHA). Retention of employees during the probationary period shall be contingent upon demonstrating that they are fully qualified and satisfactory. Only those employees who satisfactorily complete the probationary period shall acquire status as permanent employees in VHA.

(Doc. #39-3 at 12 (Exh. C)) (DSUMF #3.)

4. Even though she was a probationary employee, the policies of the VA provided for some due process before she could be terminated. The Collective Bargaining Agreement dealt with Probationary Employees and provided as follows:

2. Title 5 and Hybrid employees serve a one-year probationary period unless otherwise specified in applicable Federal law. Probationary periods will also be governed by government-wide regulations in existence at the time this Agreement was approved. During that time, employees will have the opportunity to develop and to demonstrate their proficiency. To that end, the Department agrees that probationary employees will be advised in writing of applicable critical and non-critical elements, performance standard, and general conduct expectations at the beginning of their probationary period (normally 30 days). The supervisor will explain the requirements of the probationer's position and answer any questions the employee may have.

3. From the beginning of the probationary period, the supervisor will communicate with the employee frequently, will observe the employee closely, and assist in resolving any performance and/or conduct problems. In the event that there are repeated deficiencies in the employee's conduct and/or performance that progress to a point that the deficiencies may affect the employee's continued employment, the supervisor will counsel the employee in a timely manner and document the meeting, with a copy given to the employee.

(Doc. #51-2 at 2 (Exh. Y)) (Plaintiff's Statements of Additional Fact (PSAF) #3.)

5. Ms. Gill understood that, during her probationary period, she would be evaluated on, and in making any retention determination, the VA would look at Ms. Gill's attendance, job performance, and adhere to VA policy and procedures. (Doc. #39-1 at 7 (Exh. A)) (DSUMF #4.)

4

6. Ms. Gill was assigned to the Radiology Department at the KCVAMC and, in her role as a Medical Support Assistant, she assisted veterans with obtaining radiology imaging by checking-in veterans coming in for testing, scheduling their appointments, calling and providing appointment reminders, printing out ID wristbands for veterans arriving for testing, and checking-out the veterans when their testing was completed. (Doc. #39-1 at 8 (Exh. A); Doc. #39-4 (Exh. D)) (DSUMF #5.)

7. Ms. Gill worked 40 hours per week – Thursday through Monday (covering weekends) from 7:30 a.m. to 4:00 p.m. (Doc. #39-1 at 8-9 (Exh. A)) (DSUMF #6.)

8. The Radiology Department at the KCVAMC was on two floors, performing CAT scans and ultrasound testing on the upper floor and MRIs on the lower floor. (Doc. #39-1 at 10 (Exh. A)) (DSUMF #7.)

9. On weekends, the KCVAMC had one Medical Support Assistant working the upper floor (CAT scans, ultrasounds) and one Medical Support Assistant working the lower floor (MRIs). (Doc. #39-1 at 10-11 (Exh. A)) (DSUMF #8.)

10. When Ms. Gill was working at the KCVAMC, her direct supervisor initially was Gary Lee, an African American male, and later, Courtney Mitchell, an African American female. (Doc. #39-1 at 20, 35, 43 (Exh. A); Doc. #39-5 at 1 (Exh. E)) (DSUMF #11.)

11. Neither Mr. Lee nor Ms. Mitchell supervised or oversaw the MRI Technicians. (Doc. #39-1 at 22 (Exh. A)) (DSUMF #12.)

12. Paula Hoffman became Plaintiff's second line supervisor in approximately August of 2019. (Doc. #50-12 at 3 (Exh. 13)) (PSAF #17, modified.)

5

13. On November 12, 2019, Ms. Gill was given a fully successful rating for her job performance between March 18, 2019, and September 30, 2019, meaning that the "achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher." (Doc. #50-3 (Exh. 3)) (PSAF #6, modified.)

B. Issues with Ms. Gill's Work Conduct and Performance

14. On September 13, 2019, an MRI Technician complained to VA management that Ms. Gill was providing "very poor patient care" in that Ms. Gill was not at her desk all day and she only checked in one patient the entire time she was on duty while other patients were kept sitting in the waiting area.[1] (Doc. #39-7 (Exh. G)) (DSUMF #13.)

15. On October 25, 2019, an incident report from an unnamed source, indicates that Ms. Gill was questioned about her interaction with Kathy Todd, an Oncology Nurse Coordinator, who complained that Ms. Gill refused to schedule an MRI at Ms. Todd's request, stating that she would only schedule an MRI if the patient himself or herself called and she would not do it for a nurse. (Doc.#39-8 (Exh. H)) (DSUMF #14, modified.)

---

[1] The Court notes that Plaintiff repeatedly objects to various complaints made to managers or supervisors about Ms. Gill, claiming them to be hearsay. These statements, however, are admissible as they are being cited not for the truth of the statement but for the fact the statement was made to a supervisor and are therefore not hearsay. *See Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997) (finding that in "employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay as that term is defined in Fed.R.Evid. 801(c) - statements offered to prove the truth of the matters asserted. Rather, such documents are relevant and admissible because they help explain (or may help explain) the employer's conduct.")

16. On October 31, 2019, and November 5, 2019, Ms. Gill was reminded to enter her timesheets into the KCVAMC timekeeping system. ((Doc. #39-9 (Exh. I)) (DSUMF #15, modified.)

17. On November 8, 2019, in response to an email from Marcus Burrell, the Civilian Pay Technician at KCVAMC, Ms. Mitchell noted that Ms. Gill had been asked seven times that day to enter her time. (Doc. #39-10 (Exh. J)) (DSUMF #16, modified.)

18. On November 8, 2019, Ms. Mitchell communicated to Stephanie Smith, a Human Resource Specialist at the KCVAMC, regarding Ms. Gill, reporting that she was getting "a lot of complaints about [Ms. Gill's] aggression and a not so pleasant attitude" and Ms. Mitchell was concerned that Ms. Gill was creating a "hostile work environment." Ms. Mitchell also reported ongoing and continuing problems with Ms. Gill's failure to timely request and obtain approval for leave and her failure to timely turn in timecards. (Doc. #39-11 (Exh. K)) (DSUMF #17.)

19. Ms. Mitchell forwarded an email to Daniel Karr, a human resources representative, that she sent on November 22, 2019, to the Medical Support Assistants in the Radiology Department reminding them to call veterans the day before the scheduled MRI, and told Mr. Karr that the email "was because Grecian who was the MRI MSA was not doing reminder calls as I had instructed." (Doc. #39-12 (Exh. L)) (DSUMF #18, modified.)

20. On November 25, 2019, Ms. Mitchell emailed Ms. Gill about a "double booked MRI you scheduled" and reminded Ms. Gill that MRIs were not to be double booked. (Doc. #39-13 (Exh. M)) (DSUMF #19, modified.)

21. On December 2, 2019, Ms. Mitchell emailed Ms. Gill that "Your log is exactly the same today as the one I ran on 11/25/19 only with additional names added to your log, which mean[s] you have not been working on yours. The expectation for today is to work your pending and hold

7

logs in between checking in so your log can get cleared up since evening schedules are light you should have time to work on your log during you [sic] shift." Thanksgiving was on November 28, 2019, and Ms. Gill was off work from November 27, 2019, until December 2, 2019. (Doc. #39-14 (Exh. N)) (DSUMF #20, modified; PSAF ## 75, 76, modified.)

22. By December 30, 2019, the KCVAMC was receiving complaints about Ms. Gill's "behavior and conduct with others" and how it was adversely "affecting not only [the Radiology] team, but other departmental teams and ultimately [the VA's] veterans care," including observations that:

    a. Ms. Gill's communications with others were deemed "very harsh, direct and noncompromising,"

    b. KCVAMC timekeepers' leadership reported that Ms. Gill "was extremely rude on the phone and would not listen or answer their questions,"

    c. Ms. Gill "was very confrontational, nasty and hostile with" Ms. Mitchell regarding overtime opportunities,

    d. Some of Ms. Gill's co-workers complained about Ms. Gill,

    e. One of Ms. Gill's co-workers, Pamela Pickens went to Ms. Mitchell "in tears several time[s] about [Ms. Gill] bullying her [and] talking to her aggressively in front of other employees and [making] threats,"

    f. Ms. Pickens report that she was "very scared" of Ms. Gill,

    g. MRI Technicians complained that Ms. Gill was "very aggressive" when they talked to her or when they told her that she had made an error,

    h. In October of 2019, a nurse in Interventional Radiology named Josh reported that Ms. Gill was "nasty, rude and unprofessional," and

i. In November of 2019, a VA timekeeper (Gloria) reported that Ms. Gill "came to her office and confronte[d] her about her time and she felt very uncomfortable because she was aggressive and nasty with her" and after Ms. Gill called payroll (Marcus) on speakerphone with Ms. Gill still in her office Ms. Gill "was very nasty, aggressive and abusive towards him."

(Doc. #39-15 at 1-2 (Exh. O)) (DSUMF #21, modified.)

23. On January 24, 2020, Ms. Mitchell reported to HR that she had "gotten numerous complaints from other [o]ffices about [Ms. Gill's] attitude and unprofessionalism when talking to her." In addition, Ms. Mitchell reported that Ms. Gill had made "numerous scheduling errors [but was] not receptive to criticism or being told about her mistakes." Ms. Mitchell further reported that the MRI Technicians in Ms. Gill's work area had "complained about [Ms. Gill] never being at her desk." Finally, Ms. Mitchell noted that Ms. Gill was "not taking "Urgent" orders off the printer and getting them to the technicians" which was "bad patient care." (Doc.#39-16 (Exh. P)) (DSUMF #22.)

24. Ms. Mitchell, Ms. Mitchell's supervisor (Paula Hoffman), and an Employee Relations/Labor Relation Specialist at the KCVAMC (Denise Smith) held a meeting to review the conduct of Ms. Gill and the complaints that had been received by the KCVAMC and it was decided that Ms. Gill's probationary period should be terminated due to "inappropriate conduct with [supervisors], co-workers, peers and other departments that were detrimental to the [VA's] values." (Doc. #39-5 at 3 (Exh. E)) (DSUMF #25.)

25. On February 4, 2020, the VA terminated Ms. Gill's employment within Ms. Gill's one-year probationary employment period. (Doc. #39-17 at 3 (Exh. Q)) (DSUMF #26.)

9

26. The VA made a business determination that termination was warranted in that previous reminders of expectations had not impacted Ms. Gill's behavior and Ms. Gill had failed to acknowledge that her conduct had been wrong. (Doc. #39-5 at 3 (Exh. E); Doc. #39-17 at 5 (Exh. Q)) (DSUMF #27, modified.)

27. In May of 2020, Ms. Mitchell forwarded eight emails to Daniel Karr in human resources which she stated were sent out due to Ms. Gill's conduct. Those emails were sent out to Ms. Gill and several other Medical Support Assistants and Ms. Gill was only directly referenced in one of those emails. The dates of those emails were: September 23, 2019, at 11:24 a.m., October 15, 2019, at 9:09 a.m., October 25, 2019, at 11:50 a.m., October 31, 2019, at 11:08 a.m., November 7, 2019, at 10:04 a.m., November 22, 2019, at 1:33 p.m., January 31, 2020, at 10:54 a.m., and February 4, 2020, at 10:27 a.m. (Doc. #39-17 at 4 (Exh. Q); Doc. #50-13 at 117, 118, 119, 122, 123, 124, 127, 128 (Exh. 14)) (DSUMF #24, modified.)

C. Ms. Gill's Claims of Discrimination

28. Following her termination, Ms. Gill initiated informal counseling with the VA on February 6, 2020, alleging that she had been subjected to discrimination based on: (1) harassment/hostile work environment (non-sexual); (2) termination (during probationary period); and (3) being charged as AWOL. Ms. Gill asserted, as a discriminatory basis for these actions, her race and retaliation. Ms. Gill did not assert her sex or gender as a discriminatory basis. (Doc. #39-19 (Exh. S)) (DSUMF #29.)

29. After unsuccessful informal counseling on April 22, 2020, Ms. Gill filed a formal administrative complaint of discrimination that alleged discrimination and a hostile work environment based on race and retaliation. Again, Ms. Gill did not assert her sex or gender as a discriminatory basis. (Doc. #39-20 (Exh. T)) (DSUMF #30.)

10

30. When Ms. Gill was working as a Medical Service Assistant, Pamela Pickens, another Medical Service Assistant in the Radiology Department, was a co-worker. (Doc. #39-1 at 58-59 (Exh. A)) (DSUMF #32.)

31. Like Ms. Gill, Ms. Pickens was an African American female. (Doc. #39-1 at 60 (Exh. A)) (DSUMF #33.)

32. Ms. Pickens had been with the KCVAMC "for a very long time" and, according to Ms. Gill, Ms. Pickens "would try to intimidate the new employees" and was very boisterous and "very loud." (Doc. #39-1 at 59 (Exh. A)) (DSUMF #34.)

33. After Ms. Gill and Ms. Pickens had "a situation" and "a disagreement," Ms. Gill complained to Ms. Mitchell. (Doc. #39-1 at 59, 60 (Exh. A) (DSUMF #35.)

34. Ms. Mitchell thereafter spoke to Ms. Pickens about the issue. (Doc. #39-1 at 59 (Exh. A)) (DSUMF #36.)

35. After that, Ms. Gill kept her distance from Ms. Pickens. (Doc. #39-1 at 60-61 (Exh. A)) (DSUMF #37.)

36. On January 5, 2020, when Ms. Gill arrived at work for her early morning shift, the outside door to her area was locked, even though it was supposed to be open. Ms. Gill called security who stated they were sending someone. When no one came, Ms. Gill decided to walk to the open Emergency Room at the KCVAMC, which was up the hill. Ms. Gill was on crutches at the time. (Doc. #50-1 at 26-27 (Exh. 1); Doc. #39-21 (Exh. U)) (PSAF #99, modified.)

37. Upon arrival at the Emergency Room, Ms. Gill was discussing the situation with a VA security guard, another VA security guard, Officer Hendricks, interrupted and "sarcastically" asked Ms. Gill to read the hours of operation (indicating when the doors would be unlocked). (Doc. #39-21 (Exh. U)) (DSUMF #38, modified.)

38. At some point after the initial encounter with Officer Hendricks,[2] Ms. Gill was in her work

area in the Radiology Department and had

> just checked my patient in and here comes Officer Hendrix and Officer Leibetter . . . but Officer [Leibetter] stood in the hallway while Officer Hendrix came in and came behind my desk yelling at me while my patient was in the same waiting area saying since you have an attitude this is what [it] says and was holding his cell phone in my face but I wouldn't turn around to look. I told him I have a patient and that he was being very unprofessional. I told him if he had something to say to me we could speak in a private setting, he kept yelling at me and I asked him several times to get from behind my desk I have a patient sitting here he never acknowledged anything I said. Finally he walked out still talking very loudly. I asked him for his name he ignored me. I asked again he ignored me and walked out.

(Doc. #39-12 (Exh. U)) (DSUMF #39, modified.)

39. At some point Ms. Gill was at the security guard area and started to walk away. Officer

Hendricks followed her all the way to the elevator. When she got to the elevator, he stuck his foot

in the door so it would not close. That move startled her and she got off the elevator. There was

an employee standing there, so she said, "Do you know who I can speak to about this gentleman?

This officer, he's harassing me. He's following me. And I said I don't understand." Ms. Gill was

shaken up by the officer following her and putting his foot in the elevator door. Then she pushed

the button again, got on the elevator and Officer Hendricks followed her on. Ms. Gill asked him

why he was following her and asked him his name. He would not give it. When Ms. Gill got off

the elevator, Officer Hendricks continued to follow her. She was trying to hurry to get to her office

when another officer, [Leibetter], came through the other door as if they were ambushing her. She

hurried to her desk. (Doc. #50-1 at 27-28 (Exh. 1); Doc. #39-21 (Exh. U)) (PSAF #101, modified.)

---

[2] Ms. Gill's email to Chief Gene Parker, which was sent within three hours of the encounter, and what she testified to at her deposition, are not consistent regarding the timing of the incidents contained in this factual statement and the next factual statement. However, neither party disputes that these events occurred, just the timing of the events.

12

40. Ms. Gill finally called the MRI technician that was working that day, Sabrina, and asked that Sabrina come out as Officer Hendricks was behind the desk where he was not allowed to be. Sabrina came out and spoke with the officer. Ms. Gill showed Officer Hendricks her badge and he left. (Doc. #50-1 at 29-30 (Exh. 1)) (PSAF #103, modified.)

41. Ms. Gill emailed Chief Parker at 9:43 a.m. Plaintiff's duty hours were 7:30 a.m. to 4:00 p.m. Ms. Gill was still upset more than two hours after the altercation. (Doc. #50-13 at 129 (Exh. 14)) (PSAF #104.)

42. Ms. Gill's email to Chief Parker does not suggest that the confrontation with Officer Hendricks arose because of Ms. Gill's race, but she states that she felt that she was being harassed. Ms. Gill further stated that she felt bullied and intimidated and "felt very threaten [sic] for my life[.]" (Doc. #39-21 (Exh. U); Doc. #50-13 at 129 (Exh. 14); Doc. #50-28 at 3 (Exh. 29)) (DSUMF #41, modified, and PSAF #105, modified.)

43. Ms. Gill does not know what, if any, discipline Officer Hendricks might have received as a result of her complaint to his supervisor. (Doc. #39-1 at 15 (Exh. A)) (DSUMF #42.)

44. After January 5, 2019, Officer Hendricks did not cause work issues for Ms. Gill again. (Doc. #39-1 at 16 (Exh. A)) (DSUMF #43.)

45. Ms. Gill did not immediately seek EEO counseling for the incident with Officer Hendricks or seek EEO counseling during the time she worked at the KCVAMC. The incident, however, was included in her formal EEO complaint. (Doc. #39-1 at 11-13, 16-17 (Exh. A)) (DSUMF ##44, 45, both modified.)

46. Later that same day, Sunday, January 5, 2020, after Ms. Gill believed the last patient had been seen for an MRI, Ms. Gill left work early. (Doc. #39-1 at 24-25 (Exh. A); Doc. #39-16 (Exh. P)) (DSUMF #46.)

13

47. Ms. Gill believed that the policy on weekends was if there were no more patients, a Medical Service Assistant could reach out to his or her supervisor and request to use leave and end the shift early. (Doc. #39-1 at 24-25 (Exh. A)) (DSUMF #47, modified.)

48. Ms. Gill did not ask her supervisor before leaving early on January 5, 2020. (Doc. #39-16 (Exh. P)) (DSUMF #48.)

49. On January 5, 2020, the same day Ms. Gill left early, Ms. Gill checked in a veteran for an MRI at 10:35 a.m. The patient was not checked out until January 6, 2020, at 9:13 a.m. (Doc. #39-22 (Exh. V)) (DSUMF #49, modified.)

50. In addition, after Ms. Gill left work, a veteran showed up at the KCVAMC for an MRI and, due to Ms. Gill's early exit, an MRI Technician had to perform the duties typically done by Ms. Gill.[3] (Doc. #39-16 (Exh. P)) (DSUMF #50.)

51. The next week, Ms. Mitchell had a discussion about Ms. Gill leaving work early and the patient coming in after she left. (Doc. #39-1 at 26-27 (Exh. A); Doc. #39-5 at 2 (Exh. E)] (DSUMF #51, modified.)

52. On January 11, 2020, a snowstorm was hitting the Kansas City area. (Doc. #39-1 at 18 (Exh. A)) (DSUMF #52, modified.)

53. On December 27, 2019, David Isaacks, the Director of the KCVAMC, had sent an email to all employees regarding severe weather and the VA's obligations to its patients that stated, in part:

> Weather or emergency situations may be caused by heavy snow, severe icing, flooding, earthquakes, tornadoes, massive power failure, major fires, etc. The condition must be general rather than personal in scope and impact and should be severe enough to prevent employees in significant numbers from reporting for

---

[3] Ms. Gill states that this fact is controverted but also acknowledges that a veteran did show up for an MRI. Ms. Gill asserts that the patient was not properly on the schedule. (Doc. #50 at 32; Doc. #50-1 at 48-49.)

14

work. Given our health care setting and commitment to our patients (ICARE), we must make every effort to maintain services regardless of the weather or emergency conditions. For this reason, Kansas City VA will not close during weather or emergency situations.

All employees assigned to this VA health care facility recognize that we provide 24-hour care and service, which cannot be suspended or interrupted. Therefore, all employees who provide critical services assigned to this medical center are required to be at work despite weather or emergency situations, and should make every reasonable effort to report for duty. Reasonable efforts should include leaving for work earlier than normal, establishing alternate methods for getting to work, and sheltering in place if needed. If you have an approved telework agreement, please work with your supervisor during these events to determine telework opportunities. Employees who are unable to report to work must contact the appropriate supervisor and request leave for their absence as far in advance as possible. In making a decision on a leave request, a supervisor will consider both the need to provide critical services and the individual employee's reasonable efforts to get to work.

(Doc. #39-23 (Exh. W)) (DSUMF #53, modified.)

54. On Saturday, January 11, 2020, Ms. Gill was at work as a Medical Support Assistant on the MRI floor of the Radiology Department at the KCVAMC. (Doc. #39-1 at 17-18 (Exh. A)) (DSUMF #54, modified.)

55. Two MRI Technicians also reported to work on January 11, 2020. (Doc. #39-1 at 19 (Exh. A)) (DSUMF #55, modified.)

56. After the last scheduled patient completed his MRI testing, the MRI Technicians left. (Doc. #39-1 at 19 (Exh. A)) (DSUMF #56, modified.)

57. With the snowstorm continuing, Ms. Gill became anxious about travelling home. (Doc. #39-1 at 19 (Exh. A)) (DSUMF #57.)

58. At 11:59 a.m. on January 11, 2020, Ms. Gill sent a text message to Ms. Mitchell stating: "Courtney, I'm headed home. It's getting worse out." (Doc. #39-24 (Exh. X)) (DSUMF #58.)

59. Ms. Mitchell responded by texting: "Denise just text[ed] me at 11:30 she made it[.] [A]re there any patients in MRI[?]" (Doc. #39-24 (Exh. X)) (DSUMF #59, modified.)

15

60. Ms. Gill responded by texting in rapid succession "[N]o." "She did make it[.]" "The techs been gone[.]"  (Doc. #39-24 (Exh. X)) (DSUMF #60, modified.)

61. Thereafter, Ms. Gill left the KCVAMC at approximately noon, four hours before her scheduled shift was due to end and without Ms. Mitchell "respond[ing] back to say yay or nay about [Ms. Gill] leaving."  (Doc. #39-1 at 20-21 (Exh. A)) (DSUMF #61.)

62. On January 13, 2020, Ms. Mitchell sent an email to Ms. Gill stating that:

> After further review and a conversation with HR, I will not be approving annual leave for Saturday when you left early[,] it has to be put in as AWOL.  You also left early last Sunday 1/5/19 [sic] without notifying me beforehand which resulted in a patient waiting in the hallway for over an hour and no one to attend to her, there is always a need for you to complete your tour/shift because there is always work needing to be done in the MSA world even when the Tech's are allowed to go home when there are no more appointments.  When there are no more patient[s] to be seen this allows you time to complete your work that you are behind on, also anytime you leave work you are to notify me before actually leaving and make sure it has been approved.

(Doc. #39-25 (Exh. Y)) (DSUMF #62.)

63. As a result of the AWOL, Ms. Gill was paid for the four hours that she worked on January 11 but was not paid for the four hours that she was not at work on January 11.  (Doc. #39-1 at 28-29)) (DSUMF #63, modified.)

64. After receiving the AWOL, Ms. Gill complained to the union that she should not have received an AWOL because Ms. Mitchell never responded to her text message on January 11 and "never said no . . . and basically left the door open." (Doc. #39-1 at 21 (Exh. A)) (DSUMF #64.)

65. On February 4, 2020, while still within Ms. Gill's one-year probationary period, Kathi Nippert, a Human Resource Officer at the KCVAMC, provided Ms. Gill with a letter terminating her employment with the KCVAMC, explaining:

> On or about January 21, 2020, you received an email from your supervisor identifying concerns your supervisor had with your failure to follow proper leave requesting procedures, after multiple conversations regarding the need to properly

16

request leave and have your leave approved prior to not reporting for duty and/or leaving your duty station before the end of your tour. The email identified the need for you to contact your supervisor by phone when requesting leave, and the requirement for leave to be approved, not just requested or demanded, prior to not reporting for duty, or leaving your duty station prior to the end of your tour. On or about January 24, 2020 there was another instance of you not reporting for duty, as your leave request had not been approved by your supervisor, resulting in staffing needs not being met, and your supervisor having to call in another employee on their scheduled day off. Additionally, you have been spoken to many times regarding your lack of professionalism and courtesy when speaking with both internal and external customers. You were encouraged to refresh your awareness of the VA's Standards of Conduct and the VA's ICARE values in addition to brin[g]ing any questions or concerns to your supervisory chain, specifically being asked to meet with your supervisor and myself to discuss, which you declined. Your interpersonal behavior has continued to be unsatisfactory, you have had several subsequent displays of inappropriate behavior. It has been reported you are dismissive and/or disrespectful to your peers. It has become apparent to your management chain that you do not possess the general traits or characteristics needed to be a federal employee. Your continued failure to follow proper leave requesting procedures, being present for duty when expected, and your disrespectful conduct to your peers, patients and supervisory chain cannot be tolerated.

(Doc. #39-26 at 1 (Exh. Z)) (DSUMF #66, modified.)

66. Ms. Gill believes her termination was race discrimination because: "[S]o Paula [Hoffman], by her being Caucasian, and the fact that I am African-American, I feel like it was discrimination, because she's the one that requested for me to be terminated." (Doc. #39-1 at 31 (Exh. A)) (DSUMF #67.)

67. Ms. Gill also believes that her termination was retaliation for having "filed a complaint against Officer Hendricks, and [] also the fact that [she] went to the union about the AWOL." (Doc. #39-1 at 33-34 (Exh. A)) (DSUMF #68.)

IV.    CONCLUSIONS OF LAW

In her Complaint, Ms. Gill asserts claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.*, for race discrimination and sex discrimination, disparate treatment (Count 1), hostile environment based on race, color and national origin (Count 2), and

retaliation (Count 3).  Defendant raises four issues in his motion for summary judgment:  (1) Ms. Gill did not exhaust her claim of sex discrimination; (2) Ms. Gill's retaliation claim must be dismissed because she did not engage in "protected activity" under Title VII; (3) Ms. Gill's race discrimination allegations about her AWOL charge and her termination do not survive analysis under *McDonnell Douglas*; and (4) Ms. Gill's hostile work environment claim cannot survive summary judgment because the conduct ceased after it was reported and the conduct was not sufficiently severe and pervasive.  (Doc. #39.)

A.  Exhaustion of remedies

Defendant first argues that Ms. Gill failed to exhaust a claim of sex discrimination.  (Doc. #39 at 17-18.)  After Plaintiff responded to the motion, Defendant added argument that Ms. Gill's claims of discrimination and harassment based on skin color were not administratively exhausted and therefore barred.  (Doc. #51 at 5-9.)

A plaintiff raising Title VII claims must exhaust administrative remedies prior to the filing of any civil action.  *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 949 (8th Cir. 2011). As discussed in *Watson v. O'Neill*, 365 F.3d 609 (8th Cir. 2004), the requirement to seek "timely and appropriate relief from the EEO department" of the federal agency, provides the federal agency "with notice of the charges and an opportunity to comply voluntarily with applicable statutes. This procedural requirement also affords the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, thus avoiding unnecessary judicial action."  *Watson*, 365 F.3d at 614; *see also* 29 C.F.R. § 1614.101 *et seq.*  "Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary

compliance and promoting conciliatory efforts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994).

During the administrative remedies process, Ms. Gill raised allegations of discrimination and a hostile work environment based on race and retaliation.[4]  The alleged independent acts of discrimination were the January 11 and 24, 2020, incidents where Ms. Gill was charged Absent Without Leave (AWOL), and her February 4, 2020, termination from her probationary period. (Undisputed Facts ## 28, 29, *supra*.)  The acts forming the nucleus of the hostile work environment based on race claim were the events of January 24, 2020, where Courtney Mitchell "failed to confirm whether [Ms. Gill's] January 21, 2020, leave request was approved and did not close the door when telling her", and the incident on January 31, 2020, when Courtney Mitchell "did not discuss her leave or attendance-related conduct, and canceled her one-on-one meeting relate[d] thereto[.]"  (Undisputed Fact #29; Doc. #39-20 at 2 (Exh. T).)  Neither gender nor sex were included in any of the allegations.

Failing to mention sex or "make other allegations indicative of" sex discrimination, in the administrative remedies process is fatal to a complaint of sex discrimination.  *See Tyler v. Univ. of*

---

[4] The Court notes that the record does not contain a detailed EEO complaint from Gill. There is evidence that Ms. Gill filed a formal complaint via email on April 22, 2020 (Doc. #50-13 at 3 (Exh. 14)), however, the email is a photo of the Complaint of Employment Discrimination, which is difficult to decipher, and which appears to reference an attachment.  It is unclear what that attachment is, and the following page of the exhibit is a letter to Ms. Gill regarding the assignment of an EEO Investigator.  The Court notes that in characterizing the formal complaint, Defendant cites to a letter to Ms. Gill providing notice that the informal counseling on the matter was closed and providing notice of right to file formal complaint (Doc. #39-19 (Exh. S)) and a notice of partial acceptance of the EEO Complaint following the filing of a formal complaint  (Doc. #39-20 (Exh. T)), both of which set out Ms. Gill's complaints of discrimination and a hostile work environment.  Ms. Gill does not contest Defendant's characterization and there is no evidence in the record that Ms. Gill contested the administration's characterization of her complaint, which Defendant relied upon.  (Doc. #50 at 24 (responses to DSUMF ## 29 & 30).)  Therefore, this Court finds that Defendant's characterization of the complaint to be uncontroverted.

19

*Arkansas Bd. of Trustees*, 628 F.3d 980, 989 (8th Cir. 2011) (finding a failure to exhaust administrative remedies where the complainant failed to reference gender discrimination in his charge of discrimination.)  Therefore, summary judgment is entered in favor of Defendant on Ms. Gill's claims of sex discrimination in Count 1.

Additionally, this Court finds that Ms. Gill's claims of a hostile work environment based on color is precluded because it was not included in the administrative remedies process. Furthermore, Ms. Gill's complaint fails to actually plead a claim based on color.[5]  The only references to color in Count 2 are found in the heading and casually referenced in the introductory section of paragraph 60 of the Complaint.  Paragraph 60, however, then specifically states that the "harassment was based upon Plaintiff's race[.]"  (Doc. #1 at 9 ¶ 60(c).)  It is clear that Ms. Gill based her claims of hostile work environment on race, both at the administrative level and the Complaint before this Court, and color was never raised in the administrative charge.  *See Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (finding that "[a]lthough we have often stated that we will liberally construe an administrative charge for exhaustion of remedies purposes, we also recognize that 'there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made.'")  Therefore, summary judgment in

---

[5] Rule 8 of the Federal Rules of Civil Procedure requires that a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(1).  The rule requires more than an "unadorned" complaint, but requires less than "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

favor of the Defendant is entered on Ms. Gill's claims of a hostile work environment based on color (Count 2).[6]

B.  Retaliation Claim

Defendant next argues that Ms. Gill's retaliation claim cannot survive because neither the "complaint about Officer Hendricks nor the complaint to a union official regarding her AWOL charge provides a basis for triggering the protections of Title VII's anti-retaliation provision." (Doc. #30 at 19.)  Ms. Gill argues that the complained of conduct constituted unlawful practices under Title VII and were protected activities.  (Doc. #49 at 8-10.)

Title VII bars employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  An individual raising a retaliation claim who has no direct evidence of retaliation must show that:  "(1) he engaged in a protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two."  *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 835 (8th Cir. 2008).

Ms. Gill claims that both the complaint about Officer Hendricks's conduct and her complaint to union officials regarding her AWOLs are protected activity.  Because neither of these actions involve the investigation or procedures under Title VII, the Court will treat such claims as proceeding under the opposition clause of the anti-retaliation provisions.  *See Crawford v. Metro.*

---

[6] The Court also notes that national origin discrimination was briefly referenced in the Complaint in the same way that color was referenced.  Like color, national origin was never fully developed in the Complaint, nor was it included in the administrative charge.  Furthermore, neither party mentions national origin in their briefing.  Moreover, there is no indication of Ms. Gill's national origin.  Therefore, to the extent that national origin discrimination is being alleged, Ms. Gill has failed to exhaust such claim at the administrative level.

*Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274, 129 S. Ct. 846, 850 (2009) (finding that the anti-retaliation provision of Title VII has two clauses: the opposition clause ("he has opposed any practice made an unlawful employment practice by this subchapter"); and the participation clause ("because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.") Ms. Gill must therefore "present sufficient evidence that she opposed an unlawful employment practice prior to her termination." *Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (finding that while the plaintiff "complained that she was entitled to a pay increase and a change in job title, she did not attribute [defendant's] failure to give her a raise or a promotion to sex discrimination[,]" and therefore was not engaged in a protected activity.) "An individual making a complaint must have an objectively reasonable belief that an actionable Title VII violation has occurred for the complaint to qualify as a protected activity." *Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020). Whether there was an objectively reasonable belief of an actionable Title VII violation is a determined "in light of the applicable substantive law." *Id.* at 1065.

There is no indication that Ms. Gill had an "objectively reasonable belief" that either the incident with Officer Hendricks or the complaint to the union were actionable under Title VII. In fact, regarding the incident with Officer Hendricks, Ms. Gill stated she "did not understand[] why he was so hostile toward me." (Doc. #50-13 at 59 (Exh. 14).) And in her complaint to Chief Gene Parker, Ms. Gill asked whether "your officers are trained to *treat employees*" in such a manner. (Doc. #39-21 (Exh. U, emphasis added).) There was no indication that she felt Officer Hendricks's actions constituted discriminatory conduct under Title VII. Ms. Gill has simply failed to tie either complaint to a claim of discrimination under Title VII. *See Lopez v. Whirlpool Corp.*, 989 F.3d 656, 665 (8th Cir. 2021) (finding that Plaintiff's retaliation claim failed because she "did not tie

that complaint to any discrimination, let alone sex discrimination.") Furthermore, Ms. Gill has provided no evidence that the union complaint involved race discrimination. Therefore, Ms. Gill has failed to provide any evidence that she engaged in a protected activity. Summary judgment will therefore be entered in favor of the Defendant on the retaliation claim (Count 3).

C. Allegations of Discrete Acts of Race Discrimination

Defendant next argues that the allegations of race discrimination, with regard to the KCVAMC charging Ms. Gill as AWOL and the KCVAMC's termination of her, cannot survive summary judgment. In cases, such as this one, where the Plaintiff has not brought forth direct evidence of discrimination, the court will analyze Ms. Gill's claims under the *McDonnell Douglas* burden-shifting framework. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012). Under the burden-shifting framework, the plaintiff must establish a *prima facie* case of race discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, (1973). Once plaintiff has done so, the burden then shifts to the "to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *Id.* The burden then shifts back to the plaintiff to show that the "proffered reason was, in reality, a pretext for discrimination." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). At all times, the plaintiff has the burden of persuasion and "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981).

To establish a *prima facia* case Ms. Gill must show that: "(1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment

action; and (4) the circumstances give rise to an inference of discrimination." *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023).

Defendant primarily argues that Ms. Gill is unable to show the fourth element, that the circumstances of the adverse employment action give rise to an inference of discrimination. (Doc. #39 at 23-24.) A "plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011). "Employees are similarly situated when they 'are involved in or accused of the same offense and are disciplined in different ways.'" *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (internal citations omitted).

In resisting summary judgment, Ms. Gill primarily argues that "she was treated differently than similarly situated darker skinned black women and Caucasians." (Doc. #49 at 11.) Ms. Gill, however, fails to actually provide evidence of someone outside of her protected class who was similarly situated but was treated more favorably than Ms. Gill. *See Carter v. Atrium Hosp.*, 997 F.3d 803, 809 (8th Cir. 2021) (rejecting the plaintiff's contention that "the circumstances suggest discrimination because he was disciplined for conduct that Atrium's white employees engaged in with impunity[,]" where there was no actual evidence of "similarly situated employees outside of his protected class [being] treated more favorably than him after engaging in similar misconduct.") Instead, Ms. Gill relies on affidavits of others that generally assert that the KCVAMC was a racist environment. Such evidence is not sufficient to survive summary judgment. *See Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (finding that "[c]onclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment.")

24

Furthermore, Ms. Gill has failed to show that KCVAMC's reasons for charging her with AWOL and for her termination were pretext for unlawful discrimination. KCVAMC documented the cases of AWOL and provided reasons for charging Ms. Gill with AWOL. In terminating, Ms. Gill, KCVAMC noted Ms. Gill's "continued failure to follow proper leave requesting procedures, being present for duty when expected, and . . . disrespectful conduct to . . . peers, patients and supervisory chain" as reasons for her termination. (Undisputed Fact #66, *supra*.) Ms. Gill points to her fully satisfactory performance review and affidavits of former co-workers to show that KCVAMC's reasons were a pretext for unlawful discrimination. (Doc. #49 at 15-17.)

The Eighth Circuit has long held that

[t]o demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason. This burden will not be met by simply showing that the reason advanced by the employer was false; rather, the plaintiff must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations. Specifically, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (internal quotes and citations omitted).

A plaintiff may try to show that an employee's "explanation is 'unworthy of credence ... because it has no basis in fact[,]'" as Ms. Gill has done in this matter. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). "'[T]he critical inquiry ... is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 821 (8th Cir. 2017) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009)). Ms. Gill has failed to point to any evidence that suggests KCVAMC did not actually believe that Ms. Gill was not following proper leave

procedures, was not present for duty when expected, and was not disrespectful to supervisors, co-workers, and patients. Therefore, Ms. Gill has failed to show a question of fact as to whether KCVAMC's termination was unworthy of credence.

Ms. Gill points to her fully satisfactory performance evaluation in attempting to show pretext. (Doc. #40 at 16.) "[A]lthough a history of positive performance evaluations can be powerful evidence of satisfactory performance, employers may choose to rely on recent performance more heavily than past performance." *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 750 (8th Cir. 2021) (internal quote and citations omitted). While Ms. Gill's evaluation was dated November 12, 2019, the evaluation period was between March 18, 2019, and September 30, 2019. (Undisputed Fact #13, *supra*.) The conduct upon which she was terminated largely took place after the evaluation period. (Undisputed Facts ## 14-27, 46-63, *supra*.) Therefore, the performance evaluation bears little weight.

Ms. Gill also attempts to show pretext by asserting that KCVAMC has a history of treating African-Americans differently. (Doc. #49 at 16.) To support her argument, Ms. Gill once again points to various affidavits of former co-workers and a union representative for support. As discussed earlier, however, "[c]onclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment." *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998). Furthermore, Ms. Gill has wildly claimed falsification of documents without any proof that documents were falsified. Ms. Gill's pretext argument, therefore, cannot defeat summary judgment.

Ms. Gill has failed to show a genuine dispute as to any material fact regarding her allegations of discrete acts of race discrimination and the allegations do not support a *prima facie*

case of race discrimination, nor do they show pretext. Defendant is therefore entitled to summary judgment on Count 1.

    D.  <u>Allegation of a Hostile Work Environment</u>

Defendant also argues that Ms. Gill's hostile work environment claim fails for two reasons. First, Defendant argues that to the extent that Ms. Gill raises claims based on conduct of co-workers, such claims were defeated because the conduct ceased once Ms. Gill complained to her supervisors about the conduct. (Doc. #39 at 27-28.) Defendant also argues that Ms. Gill's hostile work environment claim must fail because there is no showing of animus based on race, nor is there a showing that the harassment was severe or pervasive. (Doc. #39 at 29-30.) Ms. Gill claims she was harassed by her supervisor Courtney Mitchell, Pam Pickens, a co-worker, and Officer Hendricks, and such harassment constituted a hostile work environment. (Doc. #49 at 17.)

To survive summary judgment on her hostile work environment claim, Ms. Gill must show that: "(1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action." *Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 799 (8th Cir. 2021). "A hostile work environment is a cumulative phenomenon, composed of 'a series of separate acts that collectively constitute one 'unlawful employment practice.' While a single harassing act might not be actionable standing alone, it can be actionable as a constituent element of a larger hostile environment claim." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1124 (8th Cir. 2007) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061 (2002)). In evaluating a hostile work environment claim, courts look to the totality of the circumstances, "including the frequency and severity of the

discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016). To satisfy the severe and pervasive element, harassment must be both subjectively and objectively offensive and a plaintiff "must prove the conduct was 'extreme in nature and not merely rude or unpleasant.'" *Sutherland v. Missouri Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009).

Regarding Ms. Pickens, the Court notes that Ms. Gill attempted to insert several factual statements about Ms. Pickens that were either immaterial because they had no bearing on the claims for relief or opinion testimony by a lay witness that was not appropriate. *See* (PSAF ##18-28, 31, 37, 44-45, 79-81); *Resol. Tr. Corp. v. Fiala*, 870 F. Supp. 962, 977 (E.D. Mo. 1994) (stating that "[i]mmaterial claims are claims that have no essential or important relationship to the claim for relief."); Fed. R. Evid. 701. The uncontroverted facts regarding Ms. Pickens show that Ms. Pickens and Ms. Gill had an incident in the hallway, at which point Ms. Gill went to her supervisor, Ms. Mitchell and complained about the behavior. (Undisputed Fact #33, *supra*.) Ms. Mitchell then had a conversation with Ms. Pickens. (Undisputed Fact #34.) Thereafter, Ms. Gill kept her distance from Ms. Pickens. (Undisputed Fact #35.) Similarly, the encounter with Officer Hendricks was an isolated event, of which Ms. Gill complained to Officer Hendricks's supervisor as well as her own supervisors and had no more contact with Officer Hendricks. (Undisputed Facts ## 38-44.) Neither circumstance rises to the level of severe or pervasive harassment. Furthermore, if "an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010). In both instances, Ms. Gill had no further contact with the individual allegedly creating the hostile work environment.

Ms. Gill also asserts that false allegations were made about her by Ms. Mitchell and Ms. Pickens, but has failed to show that the allegations were in fact false or that they were made on the basis of Ms. Gill's race. In response to DSUMF #35, Ms. Gill asserts that after she "complained to Mitchell about the hostile work environment, Courtney [Mitchell] began sending emails to Pickens to make sure that the information she was sending to HR about Gill was correct." (Doc. #50 at 26.) In support of this contention, Ms. Gill cites to her own deposition testimony, but has failed to provide any other evidence to substantiate that claim. "Summary judgment is appropriate where there is no independent evidence, other than the petitioner's unsubstantiated allegations." *Pony Computer, Inc. v. Equus Computer Sys. of Missouri, Inc.*, 162 F.3d 991, 997 (8th Cir. 1998). Ms. Gill's claims of false allegations are simply unsubstantiated and cannot defeat summary judgment.

Ms. Gill also claims that the AWOLs given by Ms. Mitchell were against KCVAMC policy. But as discussed above, there is no indication that Ms. Mitchell gave the AWOLs due to Ms. Gill's race.

Simply stated, Ms. Gill's allegations of a hostile work environment fail to show that the alleged harassment was based on her race or that it was severe or pervasive. As frequently noted by the Eighth Circuit, "Title VII does not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace." *Anderson v. Fam. Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 862-63 (8th Cir. 2009) (internal quotes and citations omitted). Therefore, Ms. Gill has failed to show that there is any genuine issue of material fact such to avoid summary judgment on her hostile work environment claim. Defendant is therefore entitled to summary judgment on Count 2.

29

V.    Conclusion

Based on the foregoing, it is

ORDERED that the "Motion to Dismiss the United States as a Named Defendant" (Doc. #40) is Granted.  It is further,

ORDERED that the "Motion of the Secretary of the Department of Veterans Affairs for Summary Judgement" (Doc. #39) is Granted, and summary judgment is entered in Defendant's favor on all of Plaintiff's claims.

*/s/ Lajuana M. Counts*
LAJUANA M. COUNTS
UNITED STATES MAGISTRATE JUDGE